IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Valentin Fernandez, ) | C.A. No. 0:06-3253-CMC |
| ) | |
| Plaintiff, ) | |
| ) | OPINION AND ORDER |
| ) | ON MOTION FOR |
| ) | SUMMARY JUDGMENT |
| Spar Tek Industries, Inc., Successor in Interest to ) | |
| Superior Production Machinery, Inc., Successor in ) | |
| Interest to Superior Plywood Machinery, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This products liability action arises out of an injury which Plaintiff, Valentin Fernandez ("Fernandez"), suffered when his hand was caught in a piece of machinery used in making plywood ("Press"). The matter is presently before the court on motion of Defendant, Spar Tek Industries, Inc., ("Spar Tek") for summary judgment.[1]

This motion rests on two grounds. First, Spar Tek argues that there is no evidence that it is the corporate successor of the entity which manufactured the Press, Superior Plywood Machinery, Inc. or Superior Production Machinery, Inc. (collectively "Superior"). Second, Spar Tek argues that there is no evidence that the Press and a related piece of equipment called a Charger (also manufactured by Superior) were in essentially the same condition when Fernandez was injured (in May 2004) as when they left Superior's control (in 1981).

---

[1] Spar Tek was originally incorporated as Spare Parts Manufacturing, Inc., subsequently changing its name when the nature of the business expanded. *See* Deposition of Robert L. Rhoden (taken June 26, 2007) at 7 ("Rhoden dep. I"). Except where the name is of some significance, the court will refer to Defendant throughout this order as Spar Tek, regardless of the time frame involved.

For the reasons set forth below, the court finds both grounds to be well supported. Defendant's motion is, therefore, granted in full.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it, and the inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

**Plaintiff's Injury.** Taken in the light most favorable to the non-moving party, the facts are as follows. Fernandez was injured in May 2004, while using a Press and Charger, equipment used in making plywood. Both pieces of equipment were manufactured by Superior. The Press and Charger left Superior's control in July 1981, over twenty-two years before Fernandez was injured.

**Superior's Demise.** Superior, an entity organized under the laws of Oregon and operating in that state, went out of business in 1986 or 1987.[2] Defendant's current owner has stated his understanding that Superior's decision to go out of business was prompted by a substantial judgment awarded against Superior in a product liability action brought in the District of Louisiana by a worker who was injured while using a saw manufactured by Superior ("Louisiana Action"). *See* Rhoden affid. ¶ 5. This understanding was, however, based on secondhand information and there is no evidence Defendant or its founders had input into Superior's decision.[3]

The district court judgment in the Louisiana Action was entered in January 1985 for over $520,000 and was affirmed, in part, in June 1986, with the amount of the judgment being modified

---

[2] In his deposition, Rhoden could not recall precisely when Superior ceased operations, but believed it was in 1986 or 1987. Rhoden dep. I. at 16 & 19. He also testified that he did nothing for a while after Superior ceased operations. In his affidavit, he states that he and Hanson left Superior to form their own company (now Spar Tek) in February 1987. Rhoden affid. ¶ 2.

[3] Fernandez characterizes Rhoden's testimony as a concession that Superior went out of business to avoid paying this judgment. Dkt. No. 98 at 26. This mischaracterizes Rhoden's testimony in various respects. First, Rhoden testified that he understood but did not know first hand that Superior went out of business because of a product liability lawsuit. Rhoden dep. I at 33-34 & 48. Second, Rhoden disavowed any knowledge that Superior had gone out of business not merely because of the suit, but to avoid the resulting liability. *Id.* at 55-56. He also disavowed any involvement in the decision to liquidate. *Id.* at 54. No evidence has been presented which would contradict Rhoden with respect to any aspect of this testimony.

to over $800,000.[4]  The record before this court is silent as to whether that judgment was paid in whole or in part.

Superior did not file for bankruptcy but instead arranged for a liquidation of assets through Oregon's statutory procedures for "Assignment for the Benefit of Creditors."  Linda L. Whitehead affid. ("Whitehead affid.) ¶ 3.[5]  Linda L. Whitehead, or Linda L. Whitehead, Inc. (collectively "Whitehead"), was appointed as the Assignee of Superior's assets under this procedure.  *Id.* ¶¶ 3-8.  Whitehead's role included marshaling and selling the assets of Superior.  *Id.* ¶ 4.[6]  There is no evidence Whitehead, who also served as a Bankruptcy Trustee during the same period, had any prior relationship with Superior.  Rather, the only evidence is that her sole relationship with Superior was her short-term service as Assignee.

---

[4] *See Robertson v. Superior, Inc.,* 600 F. Supp. 790 (W.D. La. 1985) (findings and conclusions awarding $520,807.22 to worker after reduction for worker's comparative fault), *affirmed in part* 791 F.2d 402 (1986) (increasing award to $801,241.88 because comparative fault reduction was not allowed under state law).

[5] In his deposition, Rhoden stated a belief that Superior "had gone bankrupt."  Rhoden dep. at 18.  It is, however, apparent that Superior never sought bankruptcy protection but instead liquidated its assets through the more informal procedures addressed above. While Rhoden was mistaken in any belief that the liquidation was conducted through the bankruptcy court, there is no basis on which to construe that error as intentionally misleading.  *See infra* Discussion § II at 14.

[6] Linda L. Whitehead was the individual who acted on behalf of Linda L. Whitehead, Inc. In her affidavit, Ms. Whitehead concedes that she has only a limited recall of the details of her role both because of the passage of time and because she suffers from medical conditions and takes medications which affect her memory.  Nonetheless, she avers as to certain basic facts regarding the nature and conduct of the liquidation.  While Fernandez challenges the averments in Whitehead's affidavit based on her conceded limitations, he does not proffer any affirmative contrary evidence. Neither are Whitehead's conceded limitations sufficient to suggest that she has misstated (or failed to remember) the central facts regarding her role in liquidating the assets of Superior.

Whitehead avers that, as Assignee, she sold Superior's assets to a number of different entities, and that one of these entities was Spare Parts Manufacturing, Inc. (now "Spar Tek"). *See supra* n. 1. She recalls that there were a number of bidders and asserts that the sale resulted from an arm's length transaction. She further states that she did not have any prior involvement with Spar Tek. Rhoden offers affidavit testimony to the same effect: he believed Spar Tek was one of several bidders in an open bidding process, and he had no reason to believe the sale was anything other than a legitimate asset sale. Rhoden affid. ¶¶ 11 & 17.[7]

For present purposes, the court will assume that despite Rhoden and Whitehead's consistent testimony it does not compel a conclusion that the transaction was arm's length. There is, however, no contrary evidence. Thus, any claim that the transaction was *not* at arm's length is merely speculative.[8]

Whitehead recalls that she reported to the court regarding her activities. *Id.* ¶ 7. She does not, however, indicate to which court her "reports" were made, whether the reports or any other documents would have been filed, or what the court's record retention policy might be. Thus, the record is unclear with respect to what reports were made and to whom.

---

[7] Fernandez argues that Whitehead's affidavit is without foundation as to the arm's length nature of the asset sale because she would not have been privy to this information. Dkt No. 98 at 9. The court finds nothing in the record to support this claim which is directly contradicted by Whitehead's affidavit (that she was the Assignee and, as such, conducted the sale), documentary evidence relating to the sale (which confirms Whitehead's role), and Rhoden's deposition (cited above).

[8] Plaintiff argues various grounds on which the jury might disregard the testimony of Whitehead and Rhoden regarding their characterization of the nature of the sale of Superior's assets to Spar Tek. For example, he points to possible inconsistencies in Rhoden's testimony regarding the timing of the decision to form Spar Tek and Whitehead's limited recall of events and the possible absence of required filings (*infra* n. 9). He has not, however, offered any affirmative evidence that the transaction was something other than arm's length.

Fernandez's counsel has apparently made some attempt to locate records of the liquidation and has found none. *See Ricardo Lizarribar affid.* ¶¶ 2-4. He does not, however, present sufficient evidence from which a jury might conclude that required reports were not filed.[9]

**Spar Tek's Relationship to Superior.** Two former employees of Superior, Robert L. Rhoden and Henry Hansen, formed a new corporation, Spare Parts Manufacturers, Inc., ("Spare Parts") in or around February 1987, after Superior ceased operations or announced its intent to liquidate. Rhoden affid. ¶ 2 (providing date when Spare Parts was formed); Rhoden dep. at 16, 18 & 37 (indicating that he got the idea to form a spare parts or service company when customers began calling him after Superior announced its intent to go out of business); Dkt. No. 98-17 at 7 (corporate filings reflecting that Spar Tek was incorporated in February 1987 by Rhoden and Hansen). The initial purpose of Spare Parts was, as its name suggests, to provide Spare Parts to Superior's former customers. Rhoden dep. I at 48.

---

[9] In order to support a presumption that documents were not filed which should have been, Fernandez would need, first, to provide legal support for the premise that specific documents were required to be filed in a particular place and that they would, under normal circumstances, still be retained. He would then need to present a proffer of evidence from individuals with first-hand knowledge establishing the specifics of any search effort and that the search had failed to produce the expected documents. The proffered affidavit of counsel satisfies neither requirement.

In his memorandum, Fernandez identifies several courts and governmental entities whose records he claims were searched. Dkt. No. 98 at 16 (claiming search of records of the Corporate Division of the Oregon Secretary of State, the Circuit Court for Multanomah County (where Superior was located), the Oregon Department of Revenue, and the federal bankruptcy court). He cites the affidavit of his attorney as support for this claim. The cited affidavit, does not, however, mention any specific entity or court whose records were searched. Neither does it identify which records within those entities were searched or for what specific purpose. Instead, it states only that counsel "investigated the corporate history of" entities including Superior, employed the services of a title officer for a title company as well as a Westlaw document retrieval representative "for the actual physical search of this information in Portland, Oregon," and that "[t]hrough collective search, we have found no indicia of any filing or document pertaining to this apparent 'Assignment for the Benefit of Creditors' . . . which the Defendant states was formally executed and filed."

6

Rhoden had been an employee of Superior from its formation in the early 1960's until its insolvency in 1986 or 1987. Rhoden dep. I at 19-21. Hanson had also worked at Superior for a lengthy period, about twenty years. Rhoden dep. I at 11. At the time he was last employed by Superior, Rhoden was the parts and service manager. *Id.* He was unemployed for some period of time between the time Superior ceased operations and when he and Hansen took out a loan to form Spare Parts. Rhoden dep. I at 12 (stating that he could not remember the exact date when Superior ceased operations but thought it was in 1986). Hansen worked with engineering and was, at the time he left Superior, in charge of special projects. Rhoden dep. I at 11.

Hansen and Rhoden were the founders and sole owners of Spar Tek when it was formed. Rhoden dep. I at 8-9. *See also* Rhoden Dep. I at 9 (Rhoden subsequently purchased Hansen's share in the company and is now the sole owner). Neither Hansen nor Rhoden had any ownership interest in Superior, nor did they serve as officers or directors. Rhoden Affid. ¶ 3.

Although Superior was a fairly small company, Rhoden could not state with certainty who all the officers and directors were. He was, however, aware that Victor Nelson served as its president and understood that Nelson also owned the company. Rhoden dep. I at 11-12. He also identified Ed Wittington as general manager and indicated that he, Rhoden, reported either to Nelson or Wittington. Rhoden affid. ¶ 4. *See also* Rhoden affid. ¶¶ 6 (listing two other employees) & 7 (stating that, other than Nelson and Wittington, he is not aware of any other person who might be an owner, director, or shareholder). With the exception of its two founders (Rhoden and Hansen) and one low level employee who had worked on the parts desk at Superior, no other employee, owner or officer of Superior ever came to work for Spar Tek or served it in any other capacity. Rhoden dep. I at 54.

**Spar Tek's Acquisition of Selected Superior Assets.** Spar Tek (then Spare Parts) bid on and acquired certain Superior assets through the liquidation sale conducted by Whitehead. The bid invitation is dated June 1, 1987 (roughly four months after Spar Tek was incorporated). Dkt. No. 98-9. The purchase agreement was memorialized in an August 28, 1987, Agreement for the Sale and Purchase of Assets (hereinafter Agreement). Dkt. No. 98-11. The Agreement stated that Superior became insolvent on March 11, 1987, and that the Agreement was entered into between Linda L. Whitehead, Inc., as appointed assignee, and Spare Parts Manufacturing, Inc. (now Spar Tek).

The Agreement set a total price of $150,000 and allocated this total as follows: inventory ($77,165); equipment, furniture and fixtures ($67,835); and castings and patterns ($5,000). The castings and patterns were purchased, in part, to limit potential competition. Rhoden dep. I at 42 (testifying that Spar Tek does not use the castings, drawings and templates but purchased them because they were part of the assets being sold and because Spar Tek wanted to keep potential competitors from having access to these items).[10]

The Agreement expressly excludes other assets from the purchase and disavows any assumption of liability as follows:

---

[10] The Agreement states that Superior is to deliver a form as shown at Schedule C "in order that Buyer may deliver such notice to the respective foundries authorizing Buyer to use such patterns and castings." The addendum delivered in compliance with this requirement states that it "serve[s] as notice that Superior Production Machinery, Inc. and the undersigned [Assignee] have no further interest in any of the castings and patterns of Superior Production Machinery, Inc., *which you may have on your premises.*" Dkt. No. 98-15 (emphasis added). Fernandez argues that this document's reference to castings and patterns "on your premises" is evidence that *Spar Tek* was already in possession of Superior's castings and other equipment at the time it bid on Superior's assets. *See* Dkt. No. 98-2 at 21-22 (discussing exhibit at 98-15). This construction of the addendum is contrary to the plain language and obvious intent to inform *third parties* of Spar Tek's acquisition of rights to property *in the possession of those or other third-parties.*

> **2. Assets Excluded from Sale.** Buyer is not purchasing the trade names Superior and Superior PMI, logos, trademarks, goodwill, customer lists, accounts receivable, existing sales orders, unfilled orders, work-in-progress, or any intangible asset associated with the business of Superior Products Machine Inc. Buyer assumes no liability for any obligations to Superior Production Machinery, Inc. customers for warranties or unfilled orders as of the date of this Agreement.

Dkt. No. 98-11.

No evidence has been presented which would suggest that Spar Tek or Superior have ever acted other than in accord with the exclusions listed in the above-quoted paragraph. That is, there is no evidence that Spar Tek ever used Superior's trade names, logo, trademarks, goodwill, or other listed items. *See generally* Rhoden dep. I at 69-70 (disavowing such use). Spar Tek has provided parts and service to Superior's former customers, but there is no evidence that the underlying contacts were made through the use of any customer list acquired as part of the sale. Rather, the only proffered evidence indicates that Spar Tek contacted Superior's former customers (or was contacted by them), based on the customers' prior relationships with Rhoden and/or Hansen.

There is no evidence that Spar Tek intended to assume liability for Superior's debts or obligations. What evidence is available is to the contrary. Rhoden dep. I at 68-69 (disavowing any such intent). Likewise, there is no evidence that: (1) any individuals who served as officers or directors of Spar Tek ever served in a similar capacity for Superior (or vice versa); (2) the bidding for the assets was closed or limited to Spar Tek and its founders or anyone else associated with Superior; (3) the price Spar Tek paid for Superior's assets was unreasonably low (*i.e.* "a mere pittance");[11] (4) there was any transfer of stock involved in the transaction; or (5) the transaction was anything other than an arm's length transaction conducted through a disinterested third party who acted for the mutual benefit of all of Superior's creditors.

---

[11] *See infra* Discussion § I at n. 18.

**Spar Tek's Expansion.** Rhoden testified that, at the time Spare Parts was formed, he and Hansen intended only to provide spare parts to Superior's former customers. Rhoden dep. I at 6, 16-18 & 37. He further testified that the business expanded within the first year to include manufacturing machines for the plywood industry. Rhoden dep. I at 6 & 59. This expansion apparently commenced well before July 1987, with Spar Tek's development of its own line of machines for use in making plywood. Rhoden dep. I at 51, 56 & 59; Dkt. No. 98-14 (letter dated July 15, 1987).[12] These machines were not of the Superior design.

## DISCUSSION

**I.   There is no evidence that Defendant Spar Tek is the corporate successor of Superior or otherwise liable for Superior's debts.**

In order to impose liability on Spar Tek for injuries caused by a machine manufactured by Superior, Fernandez must first establish a basis for imposing successor liability. South Carolina law recognizes four circumstances under which such liability will be imposed. These circumstances were first enunciated in *Brown v. American Ry. Express Co.*, 123 S.E.2d 97, 98-99 (S.C. 1924), and have recently been summarized as follows:

> In the absence of a statute, a successor company is not ordinarily liable for the debts of a predecessor company under a theory of successor liability *unless*: (a) there was an agreement to assume such debts; (b) the circumstances surrounding the transaction indicate a consolidation of the two corporations; (c) the successor company was a mere continuation of the predecessor company; or (d) the transaction was fraudulently entered into for the purpose of wrongfully denying creditor claims.

---

[12] In his July 15, 1987 letter seeking $100,000 in financing for the purchase of some of Superior's assets, Hansen refers to Spare Parts' introduction of a "product line" to "compete" with the Superior product line. He states that Spare Parts has already "been successful in receiving orders from the industry for [Spare Parts'] style of equipment for a figure in excess of $425,000." Listed sales forecasts indicate the referenced equipment includes: direct loading systems, chargers, plywood accumulators, foam glue systems, and pre presses. This suggests that the decision to sell more than spare parts was made prior to completion of the purchase of Superior's assets. At the same time, it supports Spar Tek's claim that any equipment to be sold was of a different design than that sold by Superior.

*Walton v. Mazda of Rock Hill*, 657 S.E.2d 67, 69 (S.C. App. 2008) (citing *Simmons v. Mark Lift Indus.*, 622 S.E.2d 213, 215 (S.C. 2005)).[13]

As explained below, Fernandez offers various arguments which challenge the veracity or completeness of Defendant's proffered evidence. He does not, however, offer any affirmative evidence to support imposition of liability on Spar Tek for Superior's misdeeds.[14] While this was enough to convince the court to allow discovery, it is not enough to overcome a motion for summary judgment. *See Beale,* 769 F.2d at 214; *Ennis,* 53 F.3d at 62. As this is a matter as to which Plaintiff bears the burden of proof, this absence of evidence is fatal to his case.[15]

**Agreement to Assume Liability.** The Agreement between Spar Tek and Whitehead (as Assignee for the Benefit of Creditors) included an express provision disavowing any assumption of Superior's contractual or other liability. *See supra* at p. 9. Rhoden also testified that there was no intent to assume liabilities, contractual or otherwise. The very nature of the sale, a liquidation of assets, makes it unlikely any general obligations would be assumed by a purchaser.

---

[13] Both parties rely on South Carolina law as establishing the relevant successor liability standard. This is presumably because the injury at issue occurred in South Carolina, thus making the tort law of South Carolina applicable. Given the parties' apparent agreement that South Carolina law applies, the court has not engaged in any independent analysis of the choice of law issue.

[14] The only affirmative evidence which Plaintiff offers relates to questionable actions by Superior's owner, Norton, in regard to real estate which was owned by a separate corporation which Norton also apparently owned. Nothing suggests that Spar Tek was somehow complicit in any impropriety which may (or may not) be suggested by Norton's transfers. The only connection to Spar Tek is that it leased this real estate (the site of Superior's former operations and Spar Tek's subsequent operations) from the persons or entities to whom the property was transferred by Norton or another corporation which he owned (or persons associated with Norton). As discussed below, there is no evidence that the lease was for anything other than fair market value. *See infra* Discussion § II at 17.

[15] Fernandez appears to concede that the first circumstance addressed by *Brown* (an agreement to assume debt) is not present as he argues that there is evidence to support at least the third and fourth circumstance, and possibly the second, but does not mention the first. *See* Dkt. No. 98 at 30.

**Consolidation or Mere Continuation.** There is nothing in the circumstances surrounding Spar Tek's creation or its purchase of selected assets from Superior which would support a finding of consolidation of the two corporations or that Spar Tek is a mere continuation of Superior.[16] Most critically, there is no evidence that any officer of Spar Tek ever served as an officer of Superior or vice versa or that there were any common shareholders or other forms of common ownership. *Simmons*, 622 S.E.2d at 215, n. 1 (declining to "extend the [mere continuation] exception to cases in which there is no such commonality of officers, directors and shareholders"). Neither is there any evidence of a transfer of stock associated with the transaction (or otherwise), or any evidence that Superior or its owner(s) received anything of benefit from Spar Tek's operations.[17]

Spar Tek's purchase of the assets was funded partially through a loan. Whatever other source of funding was used, there is no evidence that it came from Superior or anyone associated with Superior (other than Spar Tek's founders who were merely former employees of Superior). Neither is the purchase price of the assets so low as to suggest that the sale was anything other than an arm's

---

[16] In what purports to be a summary of the record evidence, Fernandez makes numerous statements of "fact" contrary to the facts set forth in this paragraph. *See* Dkt No. 98 at 18. To the extent not contrary to uncontradicted evidence, Fernandez's statements rest on mere supposition or extreme overstatement.

[17] The only suggestion that Superior or its owners received something of value from Spar Tek's operations relates to Spar Tek's leasing of the building formerly occupied by Superior. *See* Dkt. No. 98 at 23. That building was owned by a different corporation which, in turn, was owned by the same individual who owned Superior (various transfers relating to this property are discussed *supra* n. 14). Assuming without deciding that the payment of the lease "benefitted" Superior's owner, there is no evidence that this "benefit" resulted from anything other than payment of the fair market rental value of the building. Thus, it would not be the sort of benefit which would suggest that the sale of assets to Spar Tek was something other than what it purported to be: an arm's length asset liquidation sale through a disinterested third party.

length transaction.[18]    *See also supra* n. 8 (noting the absence of affirmative evidence that the transaction was not arm's length).

Similarly, while there is overlap, the timing of the demise of Superior and start up of Spar Tek as well as their overlapping product lines are not so close as to suggest that Spar Tek is the mere continuation of Superior. Spar Tek was incorporated in February 1987, prior to Superior's liquidation (which commenced in March 1987), but some time after Superior had ceased operations. Prior to purchasing Superior's assets, Spar Tek began serving a limited "niche" market created by Superior's cessation of business (providing spare parts for Superior's machines). Around the time Spar Tek purchased assets from Superior in August 1987, Spar Tek expanded into the manufacture of machines used in the making of plywood. While this represented an expansion into what was apparently Superior's main line of business, the only proffered evidence is that the machines machines manufactured by Spar Tek were of a different design than those which had been manufactured by Superior.[19]

---

[18] Fernandez asserts that the total amount paid by Spar Tek for Superior's assets ($150,000) was a "mere pittance" relative to the actual value. Dkt. No. 98 at 6 & 13-15. The only evidence that the fair market value was higher is found in Hansen's letter to the bank seeking financing for the purchase. This letter estimates the value of the assets Spar Tek was considering purchasing as not less that $185,000. Thus, this evidence suggests something of a bargain (purchase for 80% of value). It does not suggest serious undervaluation. Fernandez's argument of serious undervaluation rests on the assumption that the purchase of these assets would enable Spar Tek to produce multiple machines which it could sell for $150,000 each with no further investment. There is no evidentiary support for this assumption.

[19] This sequence of events is contrary to Fernandez's assertion that Superior ceased to exist as a business entity once Spar Tek was created. Dkt. No. 98 at 18. Superior had ceased *operations* prior to Spar Tek's incorporation and, presumably, ceased to *exist* in any meaningful sense after the liquidation was complete in or after August 1987. By that point, Spar Tek had been in existence, and apparently in operation, for six or seven months.

**Fraudulent Transfer.** That leaves the possibility that Superior's liquidation and Whitehead's sale of assets to Spar Tek were fraudulently entered into for the purpose of wrongfully denying claims of one or more creditors. While there is evidence to support the conclusion that a significant liability prompted Superior to liquidate, there is no evidence that its purpose was to wrongfully deny its obligations to any creditor. Rather, Superior elected, as a corporation may, simply to cease doing business and allow the creditors to take whatever its assets might bring on the open market.[20] Most critically, Fernandez has provided no evidence that Spar Tek or its founders were in any way complicit in any plan Superior may have had to avoid paying whatever debts it owed, including the judgment in favor of an injured worker in Louisiana. *Walton,* 657 S.E.2d at 70 ("To meet the fraud exception to successor liability, the general rule is that a successor must knowingly participate in a fraudulent asset transfer. Richard L. Cupp, Jr., Redesigning Successor Liability, 1999 U. Ill. L. Rev. 845, 875-76 (1999).")

Fernandez notes that Rhoden testified to a belief that Superior had filed for bankruptcy when, in fact, no bankruptcy was filed. Given that Rhoden was neither an officer of Superior nor trained in the law, this error suggests only a misunderstanding of the nature of Superior's liquidation. It does not suggest Rhoden's complicity in some scheme to defraud Superior's creditors. In any event, Rhoden made clear that he was merely stating his understanding of Superior's motivation. He did not purport to speak for Superior or claim direct knowledge.

---

[20] The only thing "unusual" about Superior's liquidation is that it was conducted under a state law procedure rather than through the bankruptcy courts. While Fernandez questions whether the procedure was properly followed, he has presented no evidence that it was not. Neither has he presented any evidence that any irregularity which may have occurred allowed Superior to escape liability which it might otherwise have faced, particularly regarding the judgment creditor from the Louisiana action.

Fernandez also argues that Superior's liquidation was undertaken with an intent to defraud creditors (including the injured worker who was, by that time, a judgment creditor). The record before the court does not disclose how Superior's assets were distributed. Without this information, there is no basis on which to conclude that Superior's purpose was to defraud creditors, as opposed to giving each a fair share of Superior's insufficient assets.

Therefore, the evidence before the court does not support a finding of successor liability under any of the four circumstances allowed under *Brown*.

**II.    There is no evidence that the machine in question was in the same condition at the time of Plaintiff's injury as it was when it left Superior's control.**

In a product liability action brought under either negligence or strict liability theories, the plaintiff must prove each of the following elements:

> (1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user.

*Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354, 356 (S.C. App. 1998). Fernandez cannot succeed under either theory because he has proffered no evidence from which a jury could find in his favor on the second element: that the machines which caused his injury, the Press and Charger, were in essentially the same condition as when they left Superior's control.

As Fernandez's expert, McCarthy, conceded, the substantial length of time between when the machines left Superior's control (in 1981) and when Plaintiff was injured (in 2004) suggests that the machines would not have been unchanged. McCarthy dep. at 178.[21] McCarthy also testified to

---

[21] Although the present summary judgment order refers to McCarthy's testimony, it is not in any way dependent on the order excluding his testimony. That order is the subject of a motion for reconsideration. *See infra* n. 22. The present order and exclusion order are, however, consistent in concluding that McCarthy's testimony does not support a finding that the machines remained in

his belief that the interlocking chain had been added and certain warnings changed, further suggesting that changes relating to safety devices likely were made in the over twenty-two years between when the machines left Superior's control and when Fernandez was injured.[22] There is, by contrast, no affirmative evidence that the machines were in the same condition in May 2004, as they were in 1981 when last under Superior's control. Given that Fernandez must prove that the machines remained in substantially the same condition, this failure of proof is independently fatal to his case.

## CONCLUSION

For the reasons set forth above, the court concludes that Fernandez has failed to present evidence as to two critical aspects of his case: first, that Spar Tek is liable for Superior's debts or actions; and second, that the machines which caused Fernandez's injury were in essentially the same

---

the same condition from 1981 to 2004. McCarthy's testimony is, in fact, to the contrary. In any event, Fernandez has disavowed any intent to rely on McCarthy for this purpose.

[22] By separate order, the court excluded substantial portions of McCarthy's proffered opinion testimony. *See* Dkt. No. 111 (entered May 23, 2008) ("Exclusion Order"). Plaintiff has since filed a motion to reconsider that order. Dkt. No. 112 (filed June 2, 2008). Because the court concludes that Defendant is entitled to summary judgment on grounds which are not dependent on the Exclusion Order, it is unnecessary to resolve Plaintiff's motion to reconsider. The court notes, nonetheless, that Plaintiff's motion to reconsider is, in large measure, an improper attempt to make *new* arguments including by now referencing portions of the expert's report which Plaintiff claims support allowing McCarthy to rely on what is referred to in the Exclusion Order as the "McCarthy Methodology." As noted in the Exclusion Order, Plaintiff offered no such support in his original memorandum in opposition and only limited if any such support in his sur-reply. *See* Dkt. No. 111 at 4-5 (noting Plaintiff's failure to "provide any specific citations to McCarthy's deposition or report"); *id.* at 6(noting sur-reply's offer only of new affidavit, references to the defense expert's deposition (without providing the underlying deposition), and an excerpt of a third party manual including pages not mentioned in the McCarthy Methodology). Thus, the motion to reconsider does not appear to raise any proper ground for reconsideration. Instead, it is a much belated, though still insufficient, effort to satisfy Plaintiff's burden of establishing an adequate foundation for his expert's opinion.

condition as when they left Superior's control.[23]  Each of these failures is independently fatal to Fernandez's claims.  Therefore, Spar Tek's motion for summary judgment is granted in full.

    IT IS SO ORDERED.

                                              s/ Cameron McGowan Currie
                                              CAMERON MCGOWAN CURRIE
                                              UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 10, 2008

---

[23] Fernandez disavows reliance on McCarthy to establish this element of his case.  He does not, however, provide the court with any other prediction of admissible evidence which would be sufficient to support a finding that the machines remained in substantially the same condition as when delivered.